## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

TRICIA A. ATTINA,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

)
)
)
)
)
)
)
)
)
)

CASE NO. 1:24-CV-734


MAGISTRATE JUDGE
JENNIFER DOWDELL ARMSTRONG


**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Tricia A. Attina's ("Ms. Attina")
application for Supplemental Security Income (SSI). Ms. Attina seeks judicial review of that
decision pursuant to 42 U.S.C. § 1383(c)(3). (Compl., ECF No. 1.) The parties have consented to
a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of
the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 8.) For the reasons set forth
below, the Court AFFIRMS the Commissioner's final decision denying Ms. Attina's application
for benefits.

## II.    PROCEDURAL HISTORY

On December 3, 2021, Ms. Attina applied to the Social Security Administration (SSA)

---

[1] Martin O'Malley resigned as Commissioner of Social Security in November 2024. Carolyn W. Colvin
served as Acting Commissioner of Social Security from November 2024 to January 2025. Michelle A. King
thereafter served as Acting Commissioner until February 2025. Leland C. Dudek is currently serving as
Acting Commissioner.

seeking SSI benefits; she claimed that she became disabled on November 23, 2018. (Tr. 126.)[2] She identified four allegedly disabling conditions: (1) degenerative disk disease; (2) carpal tunnel; (3) arthritis in hand and feet; and (4) limited scleroderma. (Tr. 146.)

The Social Security Administration ("SSA") denied Ms. Attina's application initially and upon reconsideration. (Tr. 57, 72–75, 65, 80–81.) On October 13, 2022, Ms. Attina timely requested a hearing before an administrative law judge ("ALJ"). (Tr. 82.) She filed a brief in advance of the hearing. (Tr. 198–202.) The ALJ held a hearing on April 3, 2023, at which Ms. Attina and an impartial VE testified. (Tr. 35–50.)

On April 18, 2023, the ALJ issued a written decision finding that Ms. Attina is not disabled. (Tr. 14–34.) Ms. Attina timely appealed the ALJ's decision to the Appeals Council on July 5, 2023. (Tr. 204–09.) The Appeals Council denied Ms. Attina's appeal on February 27, 2024. (Tr. 1–6.)

On April 23, 2024, Ms. Attina timely filed her Complaint, challenging the Commissioner's final decision that Ms. Attina is not disabled. (ECF No. 1.) Ms. Attina raises the following assignment of error:

> The ALJ's RFC finding was not supported by substantial evidence because the record indicated that [Ms. Attina's] hand-held walker was medically necessary.

(Pl.'s Merits Br., ECF No. 9, PageID# 406.)

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Ms. Attina was born in February 1969 and was 52 years old on the date of her application.

---

[2] The administrative transcript appears at ECF No. 7. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 31"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 394").

(Tr. 126, 198.) She graduated high school. (Tr. 147.) While she previously worked as a babysitter, she has not worked since 2003. (Tr. 39, 146.) She lives with her son. (Tr. 147.)

**B.** **Relevant Hearing Testimony**

    *1.* **Ms. Attina's Testimony**

Ms. Attina testified at her April 3, 2023 hearing that she had not worked since leaving an abusive relationship and moving into a shelter in 2006. (Tr. 39–40.) Ms. Attina testified that she has "a lot" of difficulty walking or standing. (Tr. 40.) She stated that she has balance issues that are getting worse. (*Id.*) She stated that she falls "a lot," which is why her friend gave her a walker. (*Id.*)  She said that "[i]t's at the point now where I really need to be in a wheelchair" because "[e]ven with the walker, I'm falling because I have arthritis and carpal tunnel in my hands so it's hard for me to grip the walker." (Tr. 40–41.) Ms. Attina said her doctors know that she uses a walker and have told her to continue using it. (Tr. 41.) Ms. Attina states that she uses the walker at all times, even around the home. (*Id.*) She said that she is only able to walk without her walker for three minutes because it hurts a lot, and her hands also hurt from grasping the walker.  (Tr. 42.)

Ms. Attina testified that she falls seven to ten times per month, and her last fall occurred last week when she was getting out of the bathtub. (Tr. 42.) None of these falls resulted in broken bones or a visit to the emergency room, but she said she has sprained her ankles. (*Id.*)

Ms. Attina testified that the limitations she began experiencing in November 2018 have gotten worse.  (Tr. 43.) Because Ms. Attina's doctor told her that her weight would impact her mobility, Ms. Attina has watched what she eats, lost 40 pounds, and now weighs 200 pounds. (*Id.*) Ms. Attina testified that it takes her an hour to take a shower, and she cooks simple meals because she cannot stand very long. (Tr. 43–44.)

Ms. Attina said that she tries to get out of her house once a week. (Tr. 44.) She described

that, during a recent trip to a grocery store, she was able to get herself to the store and fill up her cart with groceries but could not stand waiting for longer than a half hour. (*Id.*) She had to leave her cart in the store, go back to the car, and go home. (*Id.*) She was "worn out" and in significant pain when she got home. (Tr. 44–45.) She does not drive, so when she goes out she uses a rideshare application and "make[s] a very specific list and try to time it where I can get the things and get out" and take the rideshare vehicle home. (Tr. 45.)

Ms. Attina's 17-year-old son helps her perform household chores.  (Tr. 44–45.)

On a typical day, Ms. Attina goes out to tell her son good morning and to have a good day at school, but she typically lays back down until lunch. (Tr. 45–46.) She tries to shower at least every other day. (*Id.*) When her son gets home from school, Ms. Attina will make a simple meal like a salad. (Tr. 46.) Then, if she is hurting too much to watch television or read a book, she will go back to bed. (*Id.*) She sometimes tries to get outside to feed birds, but there are days when she does not want to risk going downstairs because she has fallen on the stairs frequently. (*Id.*)

### 2.   *Vocational Expert's Testimony*

The ALJ asked the Vocational Expert ("VE") to consider a hypothetical individual who can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; occasionally stoop and crawl; frequently balance, kneel, and crouch; and avoid all work in unprotected heights or around dangerous moving machinery. (Tr. 47.) The ALJ also asked the VE to assume the hypothetical individual does not have a driver's license.  (*Id.* at 47–48.)

The VE opined that such an individual would be able to perform light unskilled work that exists in significant numbers in the national economy, including the work of a "routing clerk" (DOT 222.687-022), "airline security representative" (DOT 372.667-010), or "merchandise

marker." (DOT 209.587-034). (Tr. 48.)

When the ALJ asked the VE to assume that the hypothetical individual could stand or walk four hours a day and no more than one hour at a time, the VE testified that the merchandise marker and security representative positions would be eliminated. (*Id.*) The VE stated that the routing clerk would remain, but there would be a reduction of approximately 40 percent in the number of available jobs (down from 118,000). (*Id.*) The VE opined that such an individual would also be able to perform the work of a "storage facility rental clerk" (DOT 295.367-026) or "collator operator" (DOT 208.685-010). (Tr. 49.)

Ms. Attina's counsel then asked the VE to take the second hypothetical and add to it that the person requires the use of a handheld assistive device that requires the use of both upper extremities to operate, such as a walker, and that device is used at all times when the person is standing. (*Id.*) The VE testified that if the hypothetical person had those additional limitations, they would not be able to perform light work. (*Id.*)

### C. State Agency Consultants

On April 21, 2022, state agency physician Rannie Amiri, M.D. found that Ms. Attina was capable of light exertional work. (Tr. 55–56.) Specifically, Dr. Amiri found that Ms. Attina was limited to lifting, carrying, and pulling 20 pounds occasionally and 10 pounds frequently, and to standing/walking for no more than six hours and sitting for six hours out of an eight-hour workday. (Tr. 54.) Dr. Amiri also restricted Ms. Attina to frequent balancing, kneeling, and crouching; occasional climbing of ramps/stairs, stooping, and crawling; and never climbing ladders, ropes, or scaffolds. (*Id.*) Finally, Dr. Amiri found that Ms. Attina should avoid all exposure to hazards (machinery, heights, etc.) (Tr. 55.)

Dr. Amiri noted that Ms. Attina had been documented to have used a walker, but determined that in light of the medical records, a walker would not be considered medically necessary. (Tr. 55.) Dr. Amiri opined that Dr. Bradford's limitation to sedentary work was not consistent with the record evidence because Ms. Attina retained normal muscle strength, normal gait, normal range of motion, and normal grip strength. (Tr. 53–54.)

In a letter to Ms. Attina explaining the denial of her application, the Agency wrote that she "is still able to move about and use your arms and legs adequately enough to complete some types of work activities." (Tr. 75.)

In appealing the initial-level denial, Ms. Attina wrote that the swelling and rheumatoid arthritis in her feet had gotten worse, that her back and joint pain were also worse, and that she required the use of a walker even inside the home because of difficulty balancing and walking. (Tr. 159, 163.) She described further worsening in the summer of 2022. (Tr. 167.)

In August 2022, state agency reviewing physician Diane Manos, M.D., generally affirmed the findings of Dr. Amiri but further limited Ms. Attina to standing/walking for no more than four hours in an eight-hour workday and for no more than one hour at a time. (Tr. 61–63.) Dr. Manos limited Ms. Attina to work at the sedentary exertional level, but she made no finding that Ms. Attina required the use of a walker. (*See generally id.*; Tr. 63.) Dr. Manos and a disability examiner concluded that Ms. Attina was not disabled because there were at least 130 jobs to which her skills would transfer, including that of a "puller-through" (DOT 782.687-030).

In a letter to Ms. Attina explaining its reconsideration decision, the Agency wrote that it had concluded that she has "retained good enough strength, movement and capacity to sit, stand, walk, and do some lifting and carrying in order to do some types of work." (Tr. 81.)

### D.     Relevant Medical Evidence

In August 2018, Ms. Attina established care with family practice doctor Angela Brinkman, D.O. (Tr. 348.) While the reason for Ms. Attina's appointment was leg and foot pain that had worsened over the past year, Ms. Attina stated that she had not had any falls in the past year, had no difficulty walking, and no difficulty performing activities of daily living. (*Id.*) Ms. Attina described that her pain was such that she could not stand for long periods of time and said that "[i]t hurts to sit, stand or lie down." (*Id.*) On physical examination, Ms. Attina showed paravertebral muscle spasms in the L2–S1 area bilaterally; pain with range of motion in all directions; mild pain with palpitation from the feet to the knees, with more tenderness on the left knee than the right. (Tr. 349.) Dr. Brinkman referred Ms. Attina to physical therapy and a neurologist. (Tr. 350–52.)

X-ray imaging of the left knee in August 2018 was unremarkable. (Tr. 361.) Imaging of the spine revealed mild retrolisthesis of the L3 vertebrae on the L4 vertebrae; multilevel degenerative discogenic changes and mild loss of disc space at the L3–4 and L4–5 areas; and mild chronic endplate depression in the superior endplate of the L3 vertebrae. (Tr. 362.)

Ms. Attina returned to Dr. Brinkman in October 2018. (Tr. 345.) She reported no difficulty walking and no difficulty performing activities of daily living. (*Id.*) She presented with complaints of joint pain in multiple areas. (*Id.*) Ms. Attina stated she falls frequently but reported that she had not seen the neurologist (because her ride never showed up) or the rheumatologist (because she was waiting for a call back from the office). (Tr. 345–46.) Ms. Attina stated that she continues to have stiffness of her hands bilaterally and pain in her lower extremities and low back. (*Id.*) On physical examination, the lumbar spine continued to reveal paravertebral muscle spasms in the L2–S1 area bilaterally, but greater on the left side, and pain with range of motion in all

directions. (*Id.*) She continued to have pain with straight-leg raising. (*Id.*)

In January 2019, Ms. Attina presented to pain management specialist Nicholas Volchko, M.D. on referral from Dr. Brinkman with low back, feet, and leg pain. (Tr. 321.) Ms. Attina reported she had back pain for many years, but it had worsened over the past year. (*Id*) Ms. Attina said that her back pain radiated down to her legs, and standing for long periods resulted in worsening pain in her legs and feet. (*Id.*) Ms. Attina also reported balance problems for the last few months and stated she had two or more falls in the past year, though they did not result in injury. (*Id.*) Ms. Attina said she had tried physical therapy, but a few sessions worsened her pain. (*Id.*) Dr. Volchko further noted that Ms. Attina complained of balance difficulty and difficulty walking due to pain and "[u]ses a two wheel walker." (Tr. 321.) On physical examination, Ms. Attina had full ("5/5") strength bilaterally but was positive for pain in the low back, especially on the right side. (*See* Tr. 322.) Dr. Volchok started Ms. Attina on gabapentin and referred her to aquatherapy and rheumatology. (Tr. 322.)

Ms. Attina consulted with Dr. Gary Kammer, M.D., on April 1, 2019, complaining of bilateral hand and leg pain. (Tr. 261.) Dr. Kammer noted that Ms. Attina described that walking causes her "extreme" pain in the mid-feet if she walks for 20 feet without stopping to rest. (*Id.*) He documented that she is "now using a walker for stability and to help relieve the bilateral foot pain." (*Id.*) He noted that Ms. Attina said she was unable to stand more than 15 to 30 minutes "due to the back, leg, and ankle/foot pain" and "had stopped working more than two years ago as a cashier because she couldn't stand due to the lower extremity pain." (*Id.*) On physical examination, Ms. Attina's station was intact and stable. (Tr. 263.) When using a walker, Ms. Attina's gait was "waddling" with "short steppage." (*Id.*) Ms. Attina had normal muscle tone, bulk, and strength for her age and physical build. (*Id.*) Dr. Kammer ordered a battery of tests to aid in the diagnosis of

Ms. Attina's reported symptoms. (Tr. 265.)

Ms. Attina consulted with Dr. Volchko on April 18, 2019. (Tr. 318.) Ms. Attina said that a few sessions of physical therapy had worsened her pain. (*Id.*) Dr. Volchko continued to note that Ms. Attina "[u]ses a two wheel walker." (Tr. 318–19.) Dr. Volchko increased the dosage of gabapentin and ordered an MRI of Ms. Attina's spine. (Tr. 319.)

Ms. Attina consulted with Dr. Kammer on April 18, 2019, again complaining of bilateral ankle pain and difficulty walking. (Tr. 255.) In the "history of present illness" section of the medical note, Dr. Kammer wrote as follows:

> The patient returns to discuss the results of plain radiographs of the ankles and feet.
>
> She reiterates that she has significant, bilateral ankle pain for which she applies various topical emolients for pain relief. She gets modest, if any, pain relief. She requires the use of a walker both inside and outside the home for stability of gait and to reduce the weight through her legs when walking.
>
> On average, her ankle pain is ~6–7/10 when walking. Pain is characterized as deep, aching and/or sharp, and episodes of ankle throbbing. At night she experiences "restless legs" and . . . ankle pain.

(Tr. 255.)

Dr. Kammer further noted that Ms. Attina described difficulty walking (because she gets dizzy and has numbness in her hands and feet) and balancing (because her "legs get weak, now uses walker"). (*Id.*) On physical examination, Ms. Attina's station was intact and stable. (Tr. 256.) When using a walker, Ms. Attina's gait was "waddling" with "short steppage," and she was "protect[ing] [the] right ankle/foot." (*Id.*) Ms. Attina had normal muscle tone, bulk, and strength for her age and physical build. (*Id.*) There was "limited mobility" of the ankles. (Tr. 258.) Dr. Kammer noted that, after reviewing x-ray imaging, there was "no apparent reason for primary [osteoarthritis] of the ankles [with the] exception of obesity." (Tr. 259; *see also* Tr. 273–74.)

Therefore, he recommended further tests to exclude other disorders. (*Id.*)

Magnetic-resonance imaging of the lumbar spine in August 2019 revealed disc bulging at the L2–3 levels, which was causing mild central canal narrowing, as well as moderate disc bulging at the L3–4 levels, which was causing moderate narrowing. (Tr. 330–31.) She also had a small midline disc herniation and caudal extrusion at the L4–5 levels. (Tr. 331.)

Magnetic-resonance imaging of the feet and ankles in October 2019 revealed a "[h]igh-grade partial tearing of the deep and superficial fibers of the deltoid ligamentous complex," "[d]isruption of the ankle mortise" with a "[n]early complete or complete tear of the [anterior talofibular ligament (ATFL)]," a "[h]igh-grade sprain involving high-grade partial tearing of the anterior inferior tibiofibular ligament," a "mild/moderate" sprain of the calcaneofibular ligament (CFL), and osteoarthrosis in the midfoot, subtalar, and tibiotalar areas. (Tr. 272.)

Ms. Attina consulted with Dr. Volchko on October 7, 2019, to review this imaging. (Tr. 315.) Dr. Volchko noted that Ms. Attina reported an improvement of symptoms on gabapentin. (*Id.*) Dr. Volchko again noted that Ms. Attina "[u]ses a two wheel walker." (Tr. 315–16.) Dr. Volchko continued Ms. Attina on gabapentin, ordered a trial steroid injection, and recommended continued home exercise. (Tr. 316.)

Ms. Attina consulted with Dr. Kammer again on July 30, 2020, "after a 15-month hiatus," complaining of difficulty walking "secondary to a painful right ankle." (Tr. 241.) Dr. Kammer noted that Ms. Attina "is using a walker to get around" and reported several falls "due to the instability of her walking." (*Id.*) Dr. Kammer noted that Ms. Attina had not followed up with an orthopedic surgeon regarding the problem, despite an MRI in 2019 showing several internal injuries in the ankle. (*See id.*) On physical examination, Ms. Attina's station was intact and stable. (Tr. 250.) When using a walker, Ms. Attina's gait was "waddling" with "short steppage," and she

was "protect[ing] [the] right ankle/foot." (*Id.*) Ms. Attina had normal muscle tone, bulk, and strength for her age and physical build. (Tr. 250–51.) There was "limited mobility" of the ankles, apparent chronic synovitis (especially over the subtalar joint), and some pain with palpitation of the right tibiotalar joint. (Tr. 251.) Dr. Kammer recommended that Ms. Attina consult with a podiatrist to assess any foot or ankle disorder. (*Id.*)

Ms. Attina underwent a physical examination with Dr. Dorothy Bradford, D.O., on April 4, 2022. (Tr. 221–28.) An examination of Ms. Attina's lumbar spine in April 2022 revealed "[m]id lumbar dextroscoliosis" with "[s]evere asymmetric disc space loss." (Tr. 218.) The examination findings were consistent with "[d]iffuse lumbar arthritis, probable multilevel stenosis," and "[m]ultilevel Grade I retrolisthesis." (*Id.*) But Dr. Bradford assessed that Ms. Attina retained normal strength in all muscle groups, normal range of motion of all joints, and normal gait. (Tr. 228.) Indeed, she noted that Ms. Attina "moves easily," while noting that during the exam Ms. Attina used a "[w]alker for support." (*Id.*)

Dr. Bradford concluded that Ms. Attina has "[degenerative joint disease] of the lumbar spine without radiculopathy" and opined that she "can perform sedentary activity." (*Id.*) A question on a form asked Dr. Bradford to describe Ms. Attina's gait and station, specifically requesting that "[i]f an assistive device is used for ambulation, comment on its medical necessity and the patient's ability to walk without it." (Tr. 222, 225.) Dr. Bradford wrote: "Nm / walker for support." (*Id.*)

Ms. Attina consulted with podiatrist Dr. Stephen Frania on July 12, 2022, complaining that for the past year she has barely been able to ambulate, and only then "minimally with an aid of walker." (Tr. 230.) A physical examination revealed normal muscle strength but "[m]arked bilateral lower extremity edema." (Tr. 231.) Ms. Attina was counseled on exercise but declined a recommendation for a referral to physical therapy; electrophysiology tests were ordered. (Tr. 230–

31 ("Ordered: EMG/NCV[.] Denied PT recommendation for now.") Dr. Frania noted that Ms. Attina could bear weight as tolerated. (*See* Tr. 231 "WB Status: wbat.")

Ms. Attina underwent electrophysiology testing in September 2022. (Tr. 283–87.) There were multiple and reduced responses, but the physician noted that the accuracy of nerve-conduction testing was limited by lower-extremity edema and Ms. Attina's physical build. (Tr. 286, 313–14.) The physician concluded that there was no evidence of motor radiculopathy or myopathy, based on needle examinations of the lower limbs, but because of the limitations of the test "a polyneuropathy cannot be excluded." (*Id.*)

Ms. Attina consulted with Dr. Brinkman for an annual physical examination, lab work, and a mammogram on September 13, 2022. (Tr. 340.) Dr. Brinkman noted that Ms. Attina had been released from the care of Dr. Kammer. (*Id.*) Ms. Attina requested a new referral. (*Id.*) Dr. Brinkman noted that she remained under the care of Dr. Frania and "does use a walker to ambulate and states that her gait is very unsteady." (*Id.*) Dr. Brinkman then noted as follows:

> Patient admits that she sees pain management as well as having seen Rheumatology. Discussed with patient that she will need to discuss with them obtaining wheelchair vers[u]s walker types.

(Tr. 341.)

On physical examination, Ms. Attina had full range of motion in her upper and lower extremity joints. (Tr. 341.) But Dr. Brinkman noted that Ms. Attina has difficulty ambulating and an unstable gait, despite having intact "[f]inger-nose testing." (Tr. 341–42.) Dr. Brinkman referred Ms. Attina to a new rheumatologist (Elisabeth Roter). (Tr. 342–43.)

Ms. Attina consulted with Dr. Hartzfeld in a telehealth appointment on March 6, 2023. (Tr. 309–10.) Dr. Hartzfeld described the results of the recent post-surgical spinal x-ray imaging. (Tr. 309.) He noted that Ms. Attina "feels her symptoms are significantly worsening in her left leg"

with "pain becoming extremely bothersome causing her left leg to give out on her on a regular basis." (*Id.*) Dr. Hartzfeld described a conservative treatment option of physical therapy combined with cortisone shots and a nerve block, but Ms. Attina stated that she would like to proceed with a surgical option of decompressing the spine and extending the surgical fusion to a new level. (*Id.*) Dr. Hartzfeld noted that Ms. Attina "may be developing a chronic pain syndrome and may need a spinal cord stimulator and chronic pain management in the future." (*Id.*) Dr. Hartzfeld noted that Ms. Attina had been ordered a lumbar brace "to reduce pain by restricting mobility of the trunk." (Tr. 310.)

## IV. THE ALJ'S DECISION

The ALJ denied Ms. Attina's application in a decision dated April 28, 2023. (Tr. 14–34.) At Step One, the ALJ found that Ms. Attina had not engaged in substantial gainful activity since November 10, 2021. (Tr. 19.) At Step Two, the ALJ found that Ms. Attina had the following severe medically determinable impairments: morbid obesity; osteoarthritis of the bilateral ankles and feet; tear of the deltoid ligament of the right ankle; mild retrolisthesis of the lumbar spine; and fibromyalgia. (*Id.*) The ALJ further identified that Ms. Attina suffered from non-severe impairments including osteoarthritis of the left hand and "centromere antibody positive." (*Id.*) The ALJ indicated that she considered all of Ms. Attina's medically determinable impairments, both severe and non-severe, in determining her residual functional capacity. (Tr. 20.)

At Step Three, the ALJ determined that none of Ms. Attina's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20–21.)

Between Steps Three and Four, The ALJ determined that Ms. Attina had the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 416.967(b) except she can lift and/or carry up to 20 pounds occasionally, and 10 pounds frequently. She can stand and/or walk for up to four hours in an eight-hour workday, and no more than one hour at one time. She can never climb ladders, ropes, or scaffolds. However, she can occasionally climb ramps and stairs. She can occasionally stoop and crawl; and she can frequently balance, kneel, and crouch. She must avoid all work in unprotected heights[] and being around or operating dangerous moving equipment.

(Tr. 21.)

At Step Four, the ALJ determined that Ms. Attina had no past relevant work. (Tr. 29.) At Step Five, the ALJ concluded that Ms. Attina was not disabled because an individual with Ms. Attina's RFC could, based on the testimony of the VE, work as a routing clerk, storage facility rental clerk, or collator operator. (Tr. 30.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

Whether reviewing a decision to deny SSI benefits (undertaking the review authorized by 42 U.S.C. § 1383(c)(3)) or a decision to deny disability insurance benefits (reviewing under 42 U.S.C. § 405(g)), the Court uses the same standard of review. *See* 42 U.S.C. § 1383(c)(3) (final determinations under 42 U.S.C. § 1383 "shall be subject to judicial review as provided in [§] 405(g) . . . to the same extent as . . . final determinations under [§] 405 . . . .").

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d

931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

B.     **Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D.

16

Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

    **C.**    <u>**Analysis**</u>

Ms. Attina argues that the ALJ incorrectly concluded that the record did not clearly indicate that the use of Ms. Attina's walker was medically necessary. (Pl.'s Merits Br., ECF No. 9, PageID# 394.) Ms. Attina points to the following finding in Step Three of the ALJ's analysis:

> The record supports that the claimant presented to providers using a walker. However, the medical evidence of record did not clearly indicate that use of the walker was medically necessary. The claimant testified that she got her walker in approximately 2019, from a friend. However, the consultative examiner did not specifically indicate that use of an assistive device, such as the claimant's walker was medically necessary. And the record as a whole did not support that the use of a walker and/or any other assistive device was medically necessary.

(Tr. 21) (internal citations to the record omitted).

Ms. Attina points out that she described to her rheumatologist, Dr. Kammer, in April 2019

that she "requires the use of a walker both inside and outside the home for stability of gait and to reduce the weight through her legs when walking." (*See* Tr. 255.) She further points to a handwritten notation from consulting examiner Dr. Bradford in April 2022 that includes the note "Nm / walker for support" when discussing Ms. Attina's gait and station. (*See* Tr. 222, 225.) Finally, she points to Dr. Brinkman's comment in September 2022 that "patient will need to discuss with [rheumatology and pain management professionals] obtaining a wheelchair versus walker types." (Tr. 341.)

The Commissioner argues that Ms. Attina cannot show that a walker was medically necessary or the circumstances for which one would be needed, as required by the applicable regulation. (Def.'s Merits Br., ECF No. 10, PageID# 410.) The Commissioner further maintains that Ms. Attina's arguments are premised on a misreading of the record, arguing that the citations she points to were instances of her own "subjective statements about her walker usage," as opposed to "medical opinions set forth by one of her doctors." (*Id.*)

After a careful review of the record, the Court finds no reversible error in the ALJ's resolution of this issue.

Both parties direct the Court to Social Security Ruling ("SSR") 96-9p, which states as follows:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, *7.

The parties also seem to agree that caselaw from this district establishes that the medical documentation in the record must (1) establish the need for the assistive device to aid in walking or standing and (2) describe the circumstances in which it is needed. *See, e.g.*, *Berry v. Saul*, Case No. 1:18-cv-01906, 2019 WL 4600433, at *9 (N.D. Ohio Sept. 23, 2019).

Factually, the undisputed evidence shows that Ms. Attina did not get her walker from any medical professional; she got it from a friend. (Tr. 40.) Further, there is no argument from Ms. Attina that any medical record reflects a prescription for a walker or any other ambulatory aid. (*Compare* Tr. 310 (ordering a lumbar brace)).

The question that remains is whether the physicians' statements in the various medical records, in discussing Ms. Attina's walker, should nevertheless be considered a definitive medical opinion establishing that Ms. Attina needs her friend's walker all of the time when walking or standing.

After a careful review, there are certainly records that support an argument that Ms. Attina's doctors tolerated—if not condoned—her use of the walker. Dr. Kammer assessed her gait while she used the walker, without indication that he separately assessed her unassisted gait. (*See* Tr. 263, 256, 250.) Dr. Brinkman assessed Ms. Attina's gait as unstable in September 2022. (Tr. 341–42.) No medical professional documented a recommendation that she stop using the walker, which she seemingly brought to every appointment. Further, the medical records establish potential impairments for which a walker could possibly be reasonably recommended, including ankle sprains and ligament tears and lower-extremity edema, among others.

That said, the Court cannot find reversible error in the ALJ's conclusion that the medical records as a whole "did not *clearly indicate* that use of the walker was medically necessary." (Tr. 21) (emphasis added); *see also Berry* at *8 (SSR 96-9p "requires clear medical evidence before

the need for a cane may be incorporated into an RFC.").

*First*, the record adequately supports a finding of no medical necessity. The notations of a walker in the records are traceable to Ms. Attina's description of how she ambulates, or observations that she presented to medical appointments using a walker. *Compare, e.g.*, *Tripp v. Astrue*, 489 Fed. App'x 951, 955 (7th Cir. 2012) (finding that the record supported the ALJ's finding of no medical necessity, despite the record containing the claimant's self-reports that he has used a cane for years, physicians' observations that claimant used a cane, and even one physician opining specifically to the Agency that the claimant "does need a crutch"); *Blackburn v. Colvin*, No. 1:15cv1398, 2016 WL 4821766 at *5 (N.D. Ohio Sept. 15, 2016) (claimant's use of crutches and a wheelchair were not supported by medical documentation); *Robinson v. Comm'r of Soc. Sec.*, No. 5:14-cv-291, 2015 WL 1119751 at *15 (N.D. Ohio Mar. 11, 2015) (no medical necessity, despite a physician commented on multiple occasions that the claimant walked with a cane, where none of those physicians "advised [him] to do so").

Ms. Attina puts a great deal of emphasis on Dr. Bradford's notation in April 2022, "Nm / walker for support," but the nature of that question specifically asked whether the claimant was using an assistive device (she was, a "walker for support") and—if so—to opine whether the device was medically necessary. (*See* Tr. 222, 225.) Dr. Bradford, when asked specifically whether the device was necessary, declined to state the opinion that it was necessary, let alone describe the circumstances in which it must be used. (*See id.*) And while the Court notes that the question also asked Dr. Bradford to opine on whether Ms. Attina could walk without the device, which the doctor did not specifically answer, the Court cannot say that the ALJ committed reversible error by finding this notation to be less than a clear statement of medical necessity.

Ms. Attina also points to Dr. Kammer's April 2019 statement that she "requires the use of

20

a walker both inside and outside the home for stability of gait and to reduce the weight through her legs when walking"—*see* Tr. 255—that statement was made in the context of describing the history of her present illness, and in context is reasonably traceable to Ms. Attina's own description of her symptoms. Dr. Kammer made that statement immediately after describing that Ms. Attina "reiterate[d]" the quality and location of her pain and how she has been seeking pain relief. (*See* Tr. 255.) Again, the Court finds no reversible error in the ALJ's conclusion that this was not a clear medical finding of necessity.

Finally, Ms. Attina points to Dr. Brinkman's comment in September 2022 that "patient will need to discuss with [rheumatology and pain management professionals] obtaining a wheelchair versus walker types." (Tr. 341.) This statement, from her primary-care physician during a routine annual examination, is also not a clear statement of medical necessity. It can be reasonably understood in context as solely a recommendation that Ms. Attina receive *some* advice from her specialists about what, if any, ambulatory device she should be using. For example, she discussed being under the separate care of a podiatrist, pain-management professionals, and rheumatology but still said she was using her friend's walker and was still unsteady on her feet.

***Second,*** even if the medical records could be construed as a clear statement that Ms. Attina requires the use of her walker, no record establishes the circumstances in which it is needed. She points to only one record that she contends meets this requirement—Dr. Kammer's April 2019 statement that she "requires the use of a walker both inside and outside the home for stability of gait and to reduce the weight through her legs when walking." *See* Tr. 255. As discussed above, this is reasonably understood as a documentation of how Ms. Attina reported using the walker, not as a medical opinion that it is required all of the time. Moreover, the general statement that she needs the device "both inside and outside the home" is far from a specific description of the

21

circumstances in which it is needed (only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, for example).

Before concluding, the Court will address an argument raised in Ms. Attina's reply brief, namely that the Court would be curing a deficiency in the ALJ's opinion by relying solely on a post-hoc rationalization. The Court considered this argument and finds it not well-taken. The ALJ adequately and accurately summarized the medical records in evidence, acknowledged Ms. Attina's statements about her condition—specifically describing her statements about her gait and history of falls—and cited those representative portions of the record where the walker was discussed. (Tr. 21–29.) The Court is convinced that the ALJ adequately consider the particular facts of a case and explained why the ALJ found that the records did not support a finding that Ms. Attina's use of a walker was medically necessary.

For these reasons, the Court finds no reversible error in the ALJ's reasonable conclusion that Ms. Attina's use of a non-prescribed walker was medically necessary.

VI.     CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's decision denying Ms. Attina's application for benefits.

Dated: April 15, 2025

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge